IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JUVENCIO GONZALEZ          :     CIVIL ACTION
                           :
            v.             :
                           :
TEMPLE UNIVERSITY          :     NO. 11-7758


MEMORANDUM

McLaughlin, J.                          April 10, 2013

        This employment discrimination suit arises from a
decision by the defendant, Temple University ("Temple"), to
terminate the plaintiff, Juvencio Gonzalez, and eliminate his
position without making him a new job offer.  Gonzalez argues
that Temple's actions were taken on account of his race and
national origin in violation of Title VII of the Civil Rights Act
of 1964 ("Title VII") and the Pennsylvania Human Relations Act
("PHRA").  Temple has moved for summary judgment under Rule 56 of
the Federal Rules of Civil Procedure.

        After holding oral argument on March 1, 2013, the Court
will grant Temple's motion.


I.    Summary Judgment Record

        The facts described herein are undisputed unless
otherwise noted.  Inferences are drawn in the light most
favorable to Gonzalez, the non-moving party.  Am. Eagle
Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir.
2009).

A.   <u>Plaintiff's Position at Temple</u>

The plaintiff, Juvencio Gonzalez, is a Hispanic American.  He was born in New York and is of Puerto Rican descent.[1]  Gonzalez was hired by Temple in 1995 as an assistant director in its Department of Community Relations ("Department").  Gonzalez remained in that job for fifteen years until his position was eliminated in 2010.  DX 2 at 10-11, 35, 64-65, 114.

During his tenure at Temple, Gonzalez did not supervise or evaluate any other employees, although he did supervise student volunteers.  In his final year of employment as an assistant director in the Department, roughly 80% to 85% of Gonzalez's duties related to "special events," that is, assisting individuals and groups not affiliated with Temple in their requests to rent various Temple facilities for activities and events.  Gonzalez also helped run and do fundraising for a volunteer program that sent Temple students to Mexico, Belize, and Texas, and he spent approximately one week a year conducting

---

[1] At his deposition, Gonzalez noted that people of Puerto Rican descent, like himself, can be referred to interchangeably as "Latino" or "Hispanic" and that the moniker one adopts is a "matter of choice."  DX 2 (8/14/12 Gonzalez Dep.) at 64-65.  Because, in the complaint, Gonzalez identifies himself as a "Hispanic" male and for ease of reference, the Court will use the term "Hispanic" throughout this opinion when referring to Gonzalez's race.  <u>See</u> Compl. ¶ 9.

"DX" refers to the exhibits submitted by Temple in support of its motion for summary judgment, and "PX" refers to the exhibits submitted by Gonzalez as part of his opposition to that motion.

-2-

a survey of food trucks on Temple's campus to make sure they complied with health code requirements and had all necessary licenses.  Occasionally, Gonzalez would attend senior staff meetings and, "every now and then," a community relations meeting.  Gonzalez's annual salary was approximately $58,000. Id. at 65-66, 115-25, 150-51.

In yearly performance reviews between 2005 and 2009, Gonzalez received overall positive evaluations.  He was always rated between 3.0 and 4.0 on a four-point scale, which corresponds to performance somewhere in between "meets job expectations[,] GOOD SOLID PERFORMANCE" and "consistently far exceeds expectations."  PX A (Employee Performance Development Plans).  Gonzalez received annual raises and bonuses while supervised by L. Harrison Jay, Gonzalez's supervisor from 2006 to 2010, and Jay's predecessor, William Bergman.  DX 2 at 133.

B.   Other Members of the Department

While Gonzalez worked at Temple, there were five other employees in the Department: (1) L. Harrison Jay, (2) Andrea Swan, (3) Monica Padilla, (4) Myrtle Jackson, and (5) Willie Rodgers.  Jackson worked as the Department's administrative assistant.  DX 3 (8/23/12 Lawrence Dep.) at 47, 52.  Rodgers served as the director of the Pan-African Studies Community Education Program ("PASCEP"), a non-credit educational program

for community members.   DX 2 at 27; DX 3 at 34; DX 9 (8/30/12 Padilla Dep.) at 13.   Swan was one of two directors who oversaw the Department.   DX 3 at 48.   The portions of the record cited by the parties do not reflect the races of Swan, Jackson, and Rodgers.[2]

Along with Swan, Jay, who is African American, served as the other director of the Department.   He became the director of community relations for the Department in 2006 and, from that time forward, was Gonzalez's immediate supervisor.   At some point

_____

[2] In an unsworn "Aff[i]davit," Gonzalez asserts that, during the course of his fifteen years at Temple, the position of director of community relations and all higher-ranking positions within the Department were staffed exclusively by African American men and women.   PX C (Gonzalez Stmt.) ¶ 3.   Although Swan was not the director of community relations, she held an equivalent director position.   By inference, Gonzalez's statement could be taken as an assertion that Swan is African American.   In his declaration, Gonzalez also states that Padilla is "a black American" and that, at the time of her deposition, she was pursuing a master's degree at Temple, which was paid for by the university, providing her with an incentive to testify favorably on Temple's behalf.   Id. ¶¶ 1-2.

The assertions in an unsworn declaration or statement may be considered at the summary judgment stage if the declarant affirms, under the penalty of perjury, that the contents of the unsworn statement are true.   Fed. R. Civ. P. 56(c) & advisory committee's note (citing 28 U.S.C. § 1746).   Because Gonzalez's declaration does not attest to the truthfulness of the assertions contained therein, subject to the penalty of perjury, it is not a competent form of evidence on which the Court may rely in its disposition of the pending motion for summary judgment.   See Woloszyn v. Cnty. of Lawrence, 396 F.3d 314, 323 (3d Cir. 2005); see also Phillis v. Harrisburg Sch. Dist., 430 F. App'x 118, 122 (3d Cir. 2011).   The Court will, therefore, disregard the statements in Gonzalez's declaration.   Notably, including the declaration as part of the summary judgment record would not change the Court's ultimate disposition of Gonzalez's claims.

-4-

before Jay was hired, Gonzalez learned that Jay was applying for the director of community relations position.  At that time, someone in the university president's office asked Gonzalez not to apply for the director job himself and to "just play along" so that Jay could be hired as a favor to his wife.  DX 2 at 59-60, 62, 71.  Jay's wife is currently the dean of Temple's law school and previously served as an associate dean.  DX 6 (9/11/12 Jay Dep.) at 13-14.

Padilla, like Gonzalez, was an assistant director and reported to the Department's directors.  DX 9 at 7.  Padilla describes her ancestry as part Hispanic, Latino, Native American, African, and European.  Her mother was born in Jamaica and her father was born in the United States to Haitian parents.  On the 2010 census, Padilla selected the "Some Other Race" category.  DX A (2/5/13 Padilla Decl.) ¶ 3.

### C.   Lawrence's Hiring

In September 2008, Kenneth Lawrence, an African American man, was hired as Temple's Senior Vice President for Government, Community and Public Affairs.  In that position, Lawrence was responsible for overseeing the Department of Community Relations, the office of government relations, and Temple's communications department.  DX 3 at 8, 13; DX 2 at 62.

Shortly after Lawrence was hired, Gonzalez met with him

-5-

so that the two men could become better acquainted and so that
Gonzalez could highlight his connections with members of the
Pennsylvanian and Puerto Rican governments.  Gonzalez thought
this conversation might create an opportunity for him to segue
from community relations to government affairs, also under
Lawrence's supervision.  At some point during the conversation,
Lawrence stated to Gonzalez that Gonzalez needed to focus on
working with the community adjacent to Temple, which is
predominately African American, rather than the Hispanic
community.  In Gonzalez's view, Lawrence had formulated the
opinion that he was working more with Hispanics than the
community surrounding the university because Gonzalez was vice
president of a Hispanic association called Asociación de
Puertorriqueños en Marcha.  Gonzalez did not feel that Lawrence's
comment was discriminatory.  Rather, he felt that Lawrence was
brushing him off and not giving him an opportunity to become
involved in government affairs.  DX 2 at 52-59.


        D.   Restructuring of the Department
             Within several months of stepping into his new role as
senior vice president, Lawrence saw the need for a change in the
Department's structure.  Lawrence believed that the Department
was not "doing enough active outreach to the community and
working with community organizations."  He also thought the

Department could do a better job of building relationships between the university and outside businesses. Furthermore, Temple had adopted a multiyear campus development plan that was going to require the Philadelphia City Council's approval for the construction of several new large buildings on campus. Lawrence did not think that any of the present members of the Department was capable of developing a strategy for meeting with and securing support from outside groups, which would be vital to obtaining consent from the City Council for Temple's planned expansion. In Lawrence's estimation, he needed more "senior," "strategic" leadership within the Department who would think "beyond the day to day" and plan for and implement long-term strategies. He did not believe that he would be able to provide the needed senior leadership of the Department himself, given the fact that he had oversight duties in both Harrisburg and Philadelphia. DX 3 at 9-11, 14-16, 19-20, 25-26, 28-29.

Lawrence began developing a plan to create a new senior position at the helm of the Department. Lawrence met with Temple's then-president, Ann Weaver Hart, and requested permission to create the post of assistant vice president of community relations and economic development. President Hart had no objection to the proposal, but she explained that she would not increase the budget at Lawrence's disposal to fund a new assistant vice president's salary. Lawrence determined that he

would need to eliminate other Department positions to free up the
necessary funds.  Id. at 12-14.

In January or February 2010, Lawrence met in person
with the vice president of Temple's human resources department,
Deborah Hartnett, and thereafter exchanged follow-up e-mail
communications and possibly had a telephone conversation about
his reorganization plan.  Lawrence and Hartnett discussed his
idea of creating room in the budget for a new assistant vice
president position by eliminating other positions within the
Department.  Hartnett explained that Lawrence would need to
create a job description for the new assistant vice president
position and that he could work with someone in the human
resources department to do so.  DX 1 (9/20/12 Hartnett Dep.) at
12-14, 31-32.  The communications between Lawrence and Hartnett
occurred over several weeks.  DX 3 at 21.

Ultimately, Lawrence decided, as part of the
departmental reorganization, to eliminate the two assistant
director positions held by Padilla and Gonzalez.  Other than
President Hart and Vice President Hartnett, Lawrence did not
speak to anyone else about his restructuring proposal and he was
the sole decisionmaker in determining the scope of the
reorganization.  Lawrence did not reduce his plan to writing.
DX 3 at 12, 50, 54.  President Hart offered final review and
approval for the restructuring plan laid out by Lawrence and the

-8-

human resources department.  PX I (5/2/12 Hard Decl.) ¶ 6.

On March 18, 2010, Lawrence personally told the members of the Department about the restructuring.  He first notified Jay, the director of community relations.  Later that day, with Jay in attendance, Lawrence held meetings with each of Gonzalez and Padilla to inform them that they were being terminated pursuant to a departmental restructuring in which their positions had been eliminated.  DX 3 at 49-51; DX 2 at 141-42.  To provide Gonzalez and Padilla adequate time to find other employment, either within the university or elsewhere, Lawrence allowed them to remain in their assistant director positions for an additional four months from that date.  DX 3 at 42-43, 51-52; DX 2 at 143.  During the meeting with Gonzalez, Lawrence stated that he would help Gonzalez try to find a new job within the university and that Gonzalez could take time off to look for new employment.  DX 2 at 142-43.  At that meeting, Lawrence did all of the talking and Jay did not speak.  DX 3 at 29-30; DX 2 at 143.

The same day, Lawrence supplied Gonzalez with a letter memorializing his termination notice.  The letter stated that Gonzalez's position would be eliminated as of June 30, 2010.  It further stated that Gonzalez's termination was not related to his performance and was instead being effectuated as part of a departmental restructuring.  DX 5 (3/18/10 Letter).

Following the reorganization, Beverly Coleman was hired

to fill the newly created position of assistant vice president for community relations.[3]  In her new role, Coleman has handled the approval process for three buildings on Temple's campus, and has created a community support strategy plan that Lawrence hopes Temple will adopt.  Coleman's position also situates her between the Department's directors and Lawrence in the chain of command. As a result of the restructuring, Swan and Jay now report to Coleman, an assistant vice president, instead of directly to Lawrence, a senior vice president.  Because the positions held by Gonzalez and Padilla were eliminated, Swan and Jay also lost two direct reports.  In addition, Swan and Jay had their titles changed, and Jay was transferred to Temple's health sciences campus to handle community outreach at that location.  DX 3 at 27-28, 48-49; DX 6 at 53.  Swan also took over control of the student volunteers program, which she had been running in conjunction with Padilla.  Rodgers stayed in his position as director of PASCEP.  There is nothing to suggest that any of his functions were affected by the reorganization.  DX 3 at 48.

        Some of Gonzalez's duties were reassigned to Jackson, who remained as the Department's administrative assistant. Jackson did not receive a raise or promotion in title as a result of her increased responsibilities.  Other departments and

----

[3] In his briefing, Gonzalez asserts, without citation to evidence in the record, that Coleman is African American.  Pl.'s Opp. at 5.

facilities throughout the university took over Gonzalez's
responsibility for renting their event spaces to outside parties.
DX 3 at 45-47, 52-53.  Temple has not reinstated the two
assistant director positions eliminated in the 2010
restructuring.  DX 4 (12/18/12 Walton Decl.) ¶ 9.  Gonzalez never
filed a complaint of discrimination with the university regarding
the circumstances of his termination.  DX 2 at 43, 63.


    E.    Gonzalez's Employment Following Notice of Termination

          Between March and mid-July 2010 when Gonzalez worked
his last day in the Department, Lawrence spoke with Gonzalez
several times and encouraged him to apply for other positions at
Temple and outside of the university.  Lawrence did not suggest
specific open positions that would be suitable for Gonzalez, but
informed Gonzalez that he would provide him with an employment
reference in support of any application.  DX 3 at 39-40.

          Deirdre Walton, a member of Temple's human resources
department, was assigned to assist Gonzalez in his search for
other employment at Temple.  She spoke to Gonzalez on several
occasions about the Internet-based process for finding and
applying to open positions at the university.  Walton told
Gonzalez that she would answer any questions and help him with
the interview process for positions to which he had applied.
DX 4 ¶¶ 3-4.  Harry Young and Bill Hart, two other members of the

human resources department, as well as Gonzalez's supervisor, Jay, also assisted Gonzalez by identifying open positions at the university for which he appeared qualified.  Id. ¶ 4; DX 2 at 204-05.  Gonzalez did not apply to any of the positions that were suggested to him for a variety of reasons, including the fact that several paid between $4,000 and $8,000 less than his assistant director salary, offered two weeks less vacation time, or would have required him to work the night shift.  Gonzalez did not want to apply to a particular alumni affairs position recommended by Jay and Bill Hart because he thought it would require him to perform fundraising duties.  Even though Jay and Bill Hart orally assured Gonzalez that the alumni affairs job did not involve fundraising, Gonzalez decided not to apply.  DX 2 at 149-50, 154-55, 199-200, 156, 233-34.

In all, Walton has identified 110 positions at Temple that were open at some point between the time Gonzalez was first notified that his position would be eliminated and his final day of employment and for which Gonzalez met the basic qualifications.  Gonzalez applied for a total of four university positions, including two assistant vice president positions that were several steps up the seniority scale from his assistant director post.  DX 4 ¶¶ 3-8; DX 2 at 213.  Gonzalez withdrew his applications for one of the assistant vice president positions and another associate director position before the interview

process began.  Gonzalez was not qualified for the remaining
assistant director position, and the final position to which
Gonzalez applied was filled by a more qualified applicant.  DX 4
¶ 8.  According to Gonzalez, he thought that he did not need to
expend much effort finding a different position at the university
and that someone at Temple would give him a new job.  DX 2 at
186.

F.   Padilla's Employment Opportunities

The parties present disputed versions of what occurred
at Padilla's meeting with Lawrence and Jay, during which she was
notified of her termination.  Gonzalez contends that, at that
meeting, Padilla was offered a job as assistant director of
PASCEP, the community education program run by Willie Rodgers.
Gonzalez was not present at Padilla's termination meeting.  He
testified at his deposition that, as soon as Padilla left her
meeting, she told him that Jay had offered her the PASCEP
position.  According to Gonzalez, Padilla told him that Jay had
requested a response to his offer within eight days.  Id. at 32-
33, 94.

Padilla, Lawrence, and Jay, all deny that she was
offered the PASCEP position at the March 18, 2010 meeting.  DX 9
at 13-14; DX 3 at 30-32; DX 6 at 38.  Lawrence notes that a
position as assistant director of PASCEP was vacant at the time

that Padilla and Gonzalez were provided with notice of their pending terminations.  That position, however, was never filled and was eliminated due to budgetary considerations.  Lawrence further states that, if Padilla were at any time offered a job as assistant director of PASCEP, he would have been aware of it.  In the spring of 2010, there was a university-wide hiring freeze in place, and any exceptions needed to be authorized by the senior officer in charge of the department interested in making a job offer.  In the case of the PASCEP assistant directorship, that supervising senior officer was Lawrence.  Jay was not otherwise authorized to make hiring decisions for positions under Lawrence's supervision, and Lawrence neither made nor authorized any such offer to Padilla.  DX 3 at 31-34.  Padilla also denies that anyone even suggested that she apply for the PASCEP position and she specifically denies telling Gonzalez that she was offered the job.  DX 9 at 14.

Padilla did apply for and accept in July 2010 a position as external relations coordinator for Temple's department of campus safety services.  Prior to joining the Department of Community Relations, she had worked for campus safety in a different role.  Id. at 5-6, 16-17.

II.  <u>Analysis</u>[4]

      The precise contours of Gonzalez's discrimination claim
have shifted during the course of this litigation.  When this
suit began, Gonzalez alleged that he was terminated as part of
"Mr. Lawrence's thought out, strategic business plan [to change]
the face of Temple to the neighborhood black community from a
brown face to a black face."  According to the complaint, after
Gonzalez was terminated, a small number of his responsibilities
were transferred to Jay, a black male, and the rest were
transferred to Beverly Coleman, a black female hired to fill the
new assistant vice president position at the head of the
Department.  In essence, Gonzalez alleged that Temple had engaged
in a "faux 'reorganization'" designed to remove Gonzalez and
replace him with Coleman.  Compl. ¶¶ 9, 25-32.

      At the summary judgment phase, Gonzalez has
supplemented this claim with a new theory.  He now argues that
Temple discriminated against him on the basis of race and
national origin when it terminated the positions held by both him

---

    [4] Summary judgment is appropriate if there "is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving
party bears the initial burden of demonstrating the absence of
any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 323 (1986).  The Court must consider the evidence
in the light most favorable to the non-moving party.  Once a
properly supported motion for summary judgment is made, the
burden of production shifts to the non-moving party, who must set
forth specific facts showing that there is a genuine issue for
trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50
(1986).

and Padilla, whom he alleges is black, and then offered Padilla, but not Gonzalez, a different job in the Department as the assistant director of PASCEP.

These claims are governed by the familiar burden-shifting paradigm established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the McDonnell Douglas evidentiary scheme, a plaintiff must first present a prima facie claim of discrimination.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (per curiam) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)).  A prima facie claim requires a showing that (1) the plaintiff belongs to a protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination.[5]  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999).

Once a plaintiff establishes his prima facie claim, the

---

[5] Temple asserts that the prima facie standard tailored to claims of discriminatory reductions in workforce should be applied in this case.  That standard differs only with respect to the fourth prong, specifically requiring a showing that similarly situated persons outside of the plaintiff's proposed class were retained.  See, e.g., Tomasso v. Boeing Co., 445 F.3d 702, 706 n.4 (3d Cir. 2006); In re Carnegie Ctr. Assocs., 129 F.3d 290, 294-95 (3d Cir. 1997).  Here, however, Gonzalez challenges the legitimacy of the restructuring, as an initial matter, and his claim is based on, not who was retained, but Temple's personnel actions after he was terminated.  For that reason, the Court finds that the general prima facie standard articulated in Jones is the more useful analytical tool.

burden then shifts to the employer to offer a legitimate, non-discriminatory rationale for its conduct.  Sarullo, 352 F.3d at 797 (quoting McDonnell Douglas, 411 U.S. at 802).  If the defendant satisfies its burden of production, the plaintiff must demonstrate that the defendant's proffered legitimate reason for the employment action was merely pretext for discrimination.  He may do so by either (a) discrediting the suggested reason by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reasoning that a reasonable factfinder could find it "unworthy of credence" or (b) adducing evidence that discrimination was more likely than not a determinative cause of the adverse employment action.  Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir. 1994) (quotation marks and citation omitted).  That analytical framework applies in an identical manner to Gonzalez's claims under both Title VII and the PHRA.  Atkinson v. Lafayette Coll., 460 F.3d 447, 454 & n.6 (3d Cir. 2006).

The crux of the parties' dispute centers around the fourth element of Gonzalez's prima facie claim: whether the events of his termination create an inference of discrimination.  The Court concludes that they do not.  Gonzalez cannot establish a prima facie claim of race or national origin discrimination predicated on either Temple's failure to extend him an offer to become the assistant director of PASCEP or the contention that

-17-

his position was eliminated as part of a "faux" restructuring and then effectively handed over to Coleman.[6]  The Court discusses each alleged employment grievance in turn.

     A.   <u>Failure to Offer PASCEP Position</u>

     Because Gonzalez alleges that Temple engaged in discrimination by offering the PASCEP position to Padilla but not him, a necessary component of his prima facie claim is showing that Padilla is a suitable comparator, similarly situated to Gonzalez in all respects save her race and national origin. Assuming that to be the case, Gonzalez still cannot sustain a prima facie claim based on the allegation that she alone was offered a position as assistant director of PASCEP.  Gonzalez has not produced competent evidence that Padilla was ever presented with such an employment opportunity.[7]

---

[6] The Court reaches the same conclusion even if Gonzalez's claims are analyzed pursuant to a mixed-motive theory.  Gonzalez has not offered sufficient evidence that the employment decisions involved in this case were motivated in any regard by racial animus or discrimination on the basis of national origin.  <u>See</u> 42 U.S.C. § 2000e-2(m); <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 101-02 (2003).

[7] The parties dispute whether Padilla may serve as a similarly situated comparator of differing race and national origin.  Padilla states that she is of Hispanic, Latino, Native American, African, and European ancestry.  Her parents are both of Caribbean descent.  Her mother was born in Jamaica and her paternal grandparents are Haitian.  Padilla self-identified on the 2010 census as "Some Other Race."  DX A ¶ 3.  Relying on Padilla's self-described background, Temple argues that she shares Gonzalez's Hispanic and Caribbean background.  For his part, Gonzalez asserts in his briefing and in his unsworn

At the summary judgment stage, a court may only consider evidence that would be admissible at trial.  A court may not consider hearsay statements, absent an applicable hearsay exception.  Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009); Shelton v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 223 n.2 (3d Cir. 2000).  Here, Gonzalez's sole evidence that the PASCEP job was exclusively offered to Padilla is his own deposition testimony that, following Padilla's meeting with Lawrence and Jay, she told Gonzalez that Jay had offered her the position.  That is classic hearsay.  Gonzalez seeks to offer Padilla's out-of-court statement (that Jay offered her a job as assistant director for PASCEP), for the truth of the matter asserted (to prove that she was in fact offered the job).  See Fed. R. Evid. 801(c).  Both the Court and defendant's counsel noted this evidentiary issue at oral argument.  3/1/13 Hr'g Tr. at 9-13.  Plaintiff's counsel offered no explanation as to how the statement avoids exclusion on hearsay grounds.  See id. at 10-11.

For her part, Padilla denies ever telling Gonzalez that

---

statement that Padilla is black.  See, e.g., PX C ¶ 1.  The Court sees no need to address the issue of Padilla's race or national origin, though it does note the absence of any evidence in the record suggesting that she shares Gonzalez's Puerto Rican roots. Regardless, even if Padilla and Gonzalez are differently situated in terms of both race and national heritage, there is no admissible evidence in the record that she was preferentially treated following termination of their assistant director positions.

she was offered the PASCEP position and denies ever being offered or told to apply for that job.  DX 9 at 13-14.  She, Lawrence, and Jay, the only three people at the meeting in which she was notified of her imminent termination, all assert that no such offer was made.  Id.; DX 3 at 30-32; DX 6 at 38.  Indeed, according to Lawrence, Jay, who allegedly made the offer to Padilla, did not speak during that meeting.  Lawrence also stated that Jay was without authority to make such a hiring decision and that any offer, at the meeting or afterward, would need to be authorized by Lawrence, which he did not do.  DX 3 at 31-34.

That Padilla later obtained a new job in Temple's campus safety department is immaterial.  There is no evidence that Gonzalez desired or applied for that job, and Padilla's hiring as external relations coordinator for the safety department can create no inference of discrimination.

To be sure, Lawrence, Jay, and members of Temple's human resources department tried to assist Gonzalez in finding alternative employment at the university.  Id. at 39-40; DX 4 ¶ 4; DX 2 at 204-05.  Gonzalez failed to take full advantage of their help, believing that he would be offered a new job at Temple without expending much effort to find one himself.  DX 2 at 186.  Gonzalez applied to only four jobs on his own and withdrew two of those applications.  He has not asserted that Temple's failure to hire him for either of the other two

-20-

positions to which he applied was in any way discriminatory.

     B.    <u>Departmental Reorganization and Coleman's Hiring</u>

       The circumstances of the Department's reorganization, Gonzalez's termination, and Temple's decision to hire Coleman as the new assistant vice president for community relations do not otherwise create an inference of discrimination.

       For one thing, the Court is without evidence as to Coleman's race or national origin.  Gonzalez alleges in his complaint that she is black, though he says nothing about her national origin.  <u>See</u> Compl. ¶¶ 29-30.  A party may not, however, "rest upon the mere allegations or denials of the . . . pleading[s]" in opposing a motion for summary judgment and instead must establish by affidavit or other evidence specific facts showing a genuine issue for trial.  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001) (quotation marks and citations omitted).  Gonzalez offers no other evidence on this score and, therefore, has not satisfied his burden of demonstrating that Coleman was of a different race or national origin than he.  <u>See Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981) (noting that the plaintiff bears the burden of establishing his prima facie claim by a preponderance of the evidence).  Consequently, even if Temple terminated Gonzalez and replaced him with Coleman, based on the record currently before the Court,

that action would not give rise to a prima facie claim of discrimination.

Gonzalez's prima facie claim fails for yet another reason, though.  Temple did not replace him with Coleman.  Contrary to the allegations in Gonzalez's complaint, following the 2010 departmental restructuring, Coleman did not step into Gonzalez's former position or assume his duties.  Nor did she and Jay divvy up Gonzalez's responsibilities.  Indeed, Gonzalez conceded at oral argument that Coleman did not take over his functions once his position was eliminated.  3/1/13 Hr'g Tr. at 6, 23-24.  Whereas Gonzalez had oversight over certain programs and tasks within the Department, Coleman, who stepped into a position two rungs up the university hierarchy, now runs the entire Department and supervises Gonzalez's former boss, Jay.

Rather, Lawrence testified, and Gonzalez has not contradicted, that many of Gonzalez's responsibilities, including his facilities management duties, were disbursed among various other units or departments across the university.  The remainder of Gonzalez's duties were handed over to Myrtle Jackson, an administrative assistant, who took on those functions without a change in title or a raise.  Neither party has identified Jackson's race or national origin, and Gonzalez does not argue that shifting his job functions to Jackson was a discriminatory act.  The parties also have not identified the many individuals

working in the other university departments to whom Gonzalez's
duties were transferred, much less that all or most of them were
of a different race or national heritage than Gonzalez.  In sum,
there is no evidence that Temple terminated Gonzalez so that his
job functions could be performed by individuals of a different
race or national origin, and his prima facie claim of
discriminatory termination falls short.

        Even if Gonzalez could make out a prima facie claim of
discrimination, Temple has offered a legitimate, non-
discriminatory reason for restructuring the Department and
eliminating Gonzalez's position.  After arriving at Temple as the
new senior vice president for government, community and public
affairs, Lawrence determined that the Department, which was under
his supervision, required more senior leadership and that none of
the Department's current members was capable of taking on such a
role.  In particular, Lawrence needed a senior official to
oversee the process of securing City Council approval for a
number of campus development projects.  As part of that process,
Temple would need to build partnerships with community
organizations and elicit their support before the Council for its
construction proposals.  Lawrence determined that this endeavor
required long-term strategic vision.  Because, due to fiscal
constraints, Lawrence could not simply create a new position, he
decided that the best course of action was to eliminate the two

assistant director positions as a means of freeing up funds for a new assistant vice president's salary.  Lawrence obtained approval from the university president for his reorganization plan and worked with Deborah Hartnett, the vice president of human resources, to execute the restructuring.

Gonzalez argues that the need for reorganization is pretext for discrimination.  He attempts to point out weaknesses and inconsistencies in Temple's restructuring plan to prove that, as a rationale for his termination, it is "unworthy of credence." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992) (quotation marks omitted).  Gonzalez argues that a significant inconsistency exists between Temple's initial response to his complaint before the Pennsylvania Human Relations Commission ("PHRC") and the evidence in the summary judgment record.  He claims that Temple's PHRC response stated that Lawrence and Hartnett met for over a year to work on the restructuring plan, whereas their deposition testimony suggests that they met in person only once and then communicated about Lawrence's restructuring proposal over a period of a few weeks.

As Temple correctly points out, its PHRC response does not state that Lawrence and Hartnett worked together for a year on the Department restructuring plan.  Instead, it says that they worked together for about a year to "assess[] how to best serve the 2020 Plan," Temple's project for university-wide campus

development.  PX H (2/20/11 Temple Resp. to PHRC) at 3-4.  Their
discussion of Lawrence's plan to restructure the Department
appears to have been part of that larger undertaking, but the
PHRC response does not purport that the sum and substance of
their year-long interactions related to the departmental
reorganization.

Gonzalez also asserts that the evidentiary record
belies the claim in Temple's PHRC response that his termination
was part of "a long-term, well thought out, strategic business
plan."  Id. at 6.  Gonzalez argues that, because Lawrence
designed the substance of the restructuring on his own and
because it was never reduced to writing, it is implausible that
the plan was well thought out.  He also contends that Lawrence
could not provide a detailed explanation of why he needed to
restructure the Department when pressed at deposition.

Although Lawrence did not create a written proposal and
formulated the reorganization plan on his own, the Department was
quite small and its duties do not seem to have been vast.  The
need for new leadership and a possible restructuring solution do
not appear to have been particularly difficult to identify.
Lawrence did also speak to President Hart about his plan and gain
her authorization to carry it into effect.  It is true that
Lawrence has not provided many examples underpinning his
conclusion that the Department lacked requisite high-level

leadership.  Nevertheless, at deposition, Lawrence specifically noted that an assistant vice president was necessary to provide senior stewardship for the community and government relations aspects of Temple's expansion plans.  DX 3 at 24-25.

Most importantly, regardless of the amount of detail or thought exhibited by Lawrence's plan, Temple did in fact restructure the Department.  It was not, as Gonzalez suggests, a fake or illusory reorganization.  Temple created a new assistant vice president position at its head, carrying through on Lawrence's plan to place a more senior figure in charge.  From her title and her role in overseeing the approval process for three buildings on campus, Coleman's position handles the very duties that Lawrence envisioned.  Her job is certainly above Gonzalez's former position in terms of supervisory responsibility.  Temple also reorganized the rest of the Department, changing the titles, reports, and, in one instance, the office location, of other employees.  Whether Lawrence's decision to reconfigure the Department in this manner was a sound business judgment is not for this Court to say.  See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc).  To reasonably be viewed as pretextual, Gonzalez must show that Lawrence's proffered rationale for revamping the Department was a "post hoc fabrication or otherwise did not actually motivate the employment action" at issue.  Fuentes, 32

F.3d at 764.  Gonzalez has failed to do so.

Other evidence of alleged past discrimination also does not call into question the legitimacy of Temple's reason for terminating Gonzalez.  Gonzalez cannot rely on the fact that he was dissuaded from applying, in 2006, for the director position eventually filled by Jay.  Gonzalez has not demonstrated that he was asked not to apply for that job due to his race or national origin.  In fact, given that he was told by an official in the university president's office that Jay would be hired "as a favor to [Jay's] wife" and that Gonzalez should simply "play along," it appears that hiring decision was motivated by favoritism, not preference based on race or nationality.  See DX 2 at 59.  In any event, Lawrence, the singular architect of the Department's restructuring, had not yet been hired by Temple and played no part in filling the director of community relations position in 2006.  Any discriminatory animus at issue in that decision cannot be imputed to him.

Lawrence's comment to Gonzalez that he should focus more on the African American community surrounding Temple rather than the Hispanic community also does not suggest that discriminatory intent lay behind Lawrence's decision to eliminate Gonzalez's position.  The meaning of Lawrence's comment is far from clear.  Gonzalez himself did not view it as discriminatory at the time it was uttered.  Gonzalez testified that he merely

felt as though Lawrence was rebuffing his attempts to become more involved in the university's government affairs work.  <u>Id.</u> at 58-59.  From the context provided by Gonzalez, Lawrence seemingly was advising Gonzalez to focus more on his obligation, as an assistant director of Temple's Department of Community Relations, to reach out to the adjacent community than on his personal involvement in a Hispanic organization.  Even if this comment could reasonably be viewed as discriminatory, the Court finds it to be no more than a "[s]tray remark[] . . . unrelated to the decision process."  <u>Ezold</u>, 983 F.2d at 545.

The Court concludes that no genuine issue of material fact exists enabling Gonzalez to either succeed on his prima facie claim of discrimination or demonstrate that Temple's proffered reason for his termination and Coleman's hiring was pretextual.

III. <u>Conclusion</u>

For the foregoing reasons, the Court will grant Temple's motion for summary judgment.  An appropriate order issues separately.